ANTHONY T. BROWN,

              Petitioner,

          v.

SUPERINTENDENT WAKEFIELD, et al.,

              Respondents.

CIVIL ACTION

NO. 07-1098

## OPINION

June 24, 2010                                                 Pollak, J.

      Petitioner Anthony Brown filed a petition for a writ of habeas corpus (docket no. 1) seeking relief from his Pennsylvania state-court conviction for first-degree murder, recklessly endangering another person, and possession of an instrument of crime. Petitioner alleged ineffectiveness of counsel based on ten separate grounds. After reviewing the petition, Magistrate Judge Arnold C. Rapoport appointed counsel to represent Brown (docket no. 27) and determined that an evidentiary hearing was required (docket no. 32). On January 28, 2010, Judge Rapoport issued a Report and Recommendation ("R&R") (docket no. 77) recommending that Brown's petition be conditionally granted based on the ineffectiveness of petitioner's counsel due to counsel's

failure to investigate alibi witnesses and failure to file a proper notice of alibi. In Judge Rapoport's view, (1) trial counsel's representation of petitioner fell below the standard of effective assistance of counsel prescribed by *Strickland v. Washington*, 466 U.S. 668 (1984), and (2) counsel's flawed representation of petitioner was likely to have seriously compromised petitioner's defense at trial.

On April 2, 2010, the Commonwealth filed objections to the R&R (docket no. 85-88). After reviewing Judge Rapoport's R&R, I have concluded that the R&R should be approved and adopted in large part.

## I. FACTS AND PROCEDURAL HISTORY

Petitioner seeks relief from his Pennsylvania state-court conviction by alleging that his trial counsel, Tariq El Shabazz, provided ineffective assistance of counsel. Petitioner has argued that Shabazz provided ineffective assistance in several ways. The focus of this opinion, and the ground on which the R&R recommends granting the present petition, is Shabazz's failure to investigate potential alibi witness until shortly before trial, which resulted in the trial court excluding two of the alibi witnesses because Shabazz had failed to file a timely notice of alibi witnesses. Petitioner claims that at the time of the shooting, which took place at Conestoga Street and Girard Avenue, in Philadelphia, he was eating at a TGI Friday's on the Ben Franklin Parkway, a substantial distance away, and would not have been able to travel to the scene in time to have committed the crime. At trial, petitioner was able to present the testimony of friends and family members who

saw him at the restaurant. However, one of the excluded alibi witnesses, Andre Osborne, the manager of the restaurant that night, would have been the only disinterested alibi witness to place him at the restaurant. Petitioner claims that the failure to find and present this witness was ineffective assistance of counsel that prejudiced him at trial. I agree.

Since the central issue is whether petitioner's trial counsel was gravely ineffective in failing to identify and present certain alibi witnesses, it is essential to view that issue in the context of the evidence which was presented at trial by the prosecution and by the defense. As the claimed error regards the failure to investigate and present alibi witnesses, the key facts relate to petitioner's location on Labor Day, September 7, 1998. Petitioner and several alibi witnesses have stated that petitioner was at a restaurant far from the shooting scene, between approximately 8 p.m., a time that prosecution witnesses testified they first saw him at the scene shortly before the shooting, and 8:23 p.m. when a police radio call reporting the shooting went out.

A.    **Prosecution's Case at Trial**

Because Judge Rapoport's R&R provides an admirably detailed narrative, I will quote from it directly:

> Petitioner was convicted on October 1, 2000, of first-degree murder, recklessly endangering another person, and possession of an instrument of crime by a death-qualified jury. The same jury imposed a life sentence for the murder charge and Brown received concurrent one to two year sentences on the other charges.
> Mr. Brown's conviction arose from an incident that occurred on Labor Day, September 7, 1998 in the 600 block of Conestoga Street in Philadelphia that

resulted in the death of Frances Rorie. Tamika Thompson, the twelve year old granddaughter of the victim, and Tamika's aunt, Yvonne Rorie, both testified that the family attended a Labor Day block party on Conestoga Street. (N.T. 9/22/00 at 460-61.) Earlier in the day, Tamika's cousins, who also lived on the block, had an argument with children who lived around the corner on Girard Avenue. (Id. at 464.) Shortly after the argument, Kim Brown, Anthony Brown's sister and the mother of the children from Girard Avenue, came to Conestoga Street to investigate the argument along with her friend Sharon Carter. (Id. at 470.) The two women approached Tamika, who told them to go see her mother at 647 Conestoga Street. Tamika's mother, Alanda Rorie, Frances Rorie and Yvonne Rorie became engaged in an argument with [] Kim Brown and Sharon Carter over the children. (Id. at 472-73.)[1]

Although the two women from Girard Avenue retreated, the inter-family argument continued to escalate through[out] the day at the corner of Conestoga and Girard with Kim Brown's son, Hakim, throwing a rock at Yvonne's son, Rafeek, the Rorie women then renewing the confrontation with the Brown women, the wielding of brooms and kitchen knives, and a threat by a friend of the Browns named Kareema to "spray the whole corner." (Id. at 476-492; N.T. 9/25/00 at 610-616.). Later Kareema was seen standing at the corner with the Petitioner, Anthony Fingers a/k/a "Black Anthony," Kevin Johnson, and two other unidentified males. Kareema was seen pointing toward the Rorie house. (N.T. 9/22/00 at 492-96; N.T. 9/25/00 at 619-20.)

R&R 1-3.

Tamika Thompson and Yvonne Rorie were the witnesses who testified that they saw petitioner standing on the corner with Kareema, Anthony Fingers, Kevin Johnson, and two other unidentified males. R&R 2. Yvonne Rorie testified that after she saw this occur:

---

[1] Kim Brown at one point paged petitioner, possibly to inform petitioner of the situation, and petitioner called her back from a payphone at the TGI Friday's where he was eating. Notes of Testimony at Trial (N.T.) 1088-91; 1174-75. Kevin Johnson testified that petitioner told him the phone call was regarding the dispute between the children. N.T. 1174-75. Petitioner disputed this. N.T. 1088-91.

> Then say about 15, 20 minutes later we heard a gunshot. It was a single gunshot. And my niece Tiffany ran around the corner of Popular and Conestoga and she said, here come the guys with the guns. And we told her to stop playing. She's like, I swear to F'ing God, ans she ran into the house. And that's when I saw a gentleman step around the corner of Poplar and Conestoga Street and he started shooting.

N.T. 620. On cross examination, Yvonne Rorie confirmed that the shooting occurred 15-20 minutes after the meeting between the men and Kareema. N.T. 652. Tamika Thompson also testified that Kareema met petitioner and pointed down the block. N.T. 492-96. On cross examination, she was unsure about the time between the meeting and the shooting, stating that "[i]t wasn't no five minutes later. It was longer than that. I wasn't counting time." N.T. 570-71.

Following this encounter:

> Tamika Thompson saw her cousin Tiffany Thompson come around the corner yelling "they're coming, they got a gun." Tamika and Yvonne both testified that they saw four men at the corner; at least two had guns and one pointed at the Rorie home and started shooting. Frances Rorie was fatally shot in the head. Tamika described the assailant to the police shortly after the incident. She stated that he was tall, light-skinned, skinny, about 22 years old, was wearing a blue cap with a red brim, a white shirt and blue jean shorts and drove a four-door gray car. (N.T. 9/22/00 at 519-21.) Tamika identified Anthony Brown from a photo spread three days after the shooting. (N.T. 9/26/00 at 745.) At the preliminary hearing and again at trial, Tamika Thompson identified Anthony Brown as one of the shooters. (N.T. 9/22/00 at 493, 500, 527.)
> Yvonne Rorie identified Anthony Brown as the specific shooter who aimed at and fired upon her mother, Frances Rorie, who was sweeping the sidewalk at the time. (N.T. 9/25/00 at 620-625.) Yvonne also picked out Brown's picture from a photo spread shortly after the murder. (Id. at 641; N.T. 9/26/00 at 748.) Shortly after the murder, Yvonne described the assailant as light-skinned and taller than herself, wearing a white shirt, blue or black shorts and a white baseball cap. (N.T. 9/25/00 at 643-47.)
> Philadelphia Police Officer Anthony Griffin testified that he heard a flash radio

call at 8:23 or 8:24 p.m. reporting the shooting. (N.T. 9/21/00 at 350, 366.) At the scene, Tiffany Thompson told the responding officers that the shooter lived at 5408 Girard Avenue. (Id. at 357-59.) The officers knocked on the door of the home, announced their presence, and were let in the residence by Sharon Carter. (Id. at 360.) After a search warrant was obtained, officers discovered clothing matching the description given by Yvonne and Tamika, including a plain white tee shirt, dark blue jean shorts, brown boots and an Atlanta Braves baseball cap; a photograph of the Petitioner; mail in his name; and a moving violation citation. (N.T. 9/ 25/00 at 723- 25.) The murder weapon was never recovered. (N.T. 9/25/00 at 696.) However, forensic evidence determined that the weapon used was a 9 mm Uzi pistol. (Id.)

R&R 3-4.

Thus, according to the testimony presented at trial, the shooting would have had to occur before 8:23, as the police radio call reporting the shooting came out over the air at 8:23 or 8:24 p.m. R&R 4. Petitioner's asserted meeting with Kareema Latimer would have had to have been seen by Yvonne and Tamika at or shortly after 8:00 p.m., making the assumption that the police radio call occurred immediately subsequent to the shooting.

**B.      Petitioner's Alibi Defense at Trial**

During trial, when petitioner's counsel attempted to call alibi witnesses**,** the prosecution objected to their testimony because Shabazz failed to file a notice of alibi, which would list the alibi witnesses that would testify. N.T. 902.[2] Shabazz claimed that notice was filed, but later admitted he did not file the notice. N.T. 902-03, 922. The

---

[2] As relevant testimony was given both at trial and during an evidentiary hearing before Judge Rapoport regarding the present habeas petition, I refer to the trial transcripts as notes of testimony (N.T.) while the testimony at the evidentiary hearing is referred to by citing the transcript of the evidentiary hearing (Transcript).

prosecution did not want the court to prevent the witnesses from testifying, because it

feared a later ineffective assistance of counsel claim.  N.T. 905.  It requested that a jury

instruction explain that no notice was filed for the alibi witnesses.  N.T. 905.  Instead of

granting the prosecution's request, the trial court allowed only three of the five proposed

alibi witnesses to testify because the prosecution had received written statements from

them.  N.T. 922-25.  The trial court excluded the only alibi witnesses who did not have

prior connections to petitioner, the manager of the TGI Friday's, Andre Osborne, and the

waitress who served petitioner, Stacy Szmyt.  N.T. 924-25.  Following the exclusion of

these witnesses:

> At trial, Brown presented both a misidentification defense and an alibi defense. Gary Jones, a grandson of Frances Rorie, testified on direct examination for the defense that the shooter was short and dark-skinned, wore a plaid shirt, blue shorts, black Timberland boots and a red and blue Atlanta Braves baseball cap. (N.T. 9/26/00 at 788, 792.) He described another person at the scene who was not the shooter as a light-skinned, bald, mustachioed man wearing a white tee shirt, blue shorts, and Reebok sneakers. (Id. at 790.) On cross-examination, Mr. Jones was impeached with a statement he gave to police on the night of the murder, in which he described the shooter as tall and light-skinned, wearing an Atlanta Braves cap, light blue shorts, white shirt and black boots. (Id. at 805.)
> Timmsel Rorie, another of Frances Rorie's daughters, testified on direct examination for the defense that she described the shooter to police on the day of the murder as tall and light-skinned, and wearing a red plaid shirt. (Id. at 821.) She also described one of the other men with the shooter as being Anthony Brown, a tall, light-skinned man of 18 or 19, wearing a white shirt and long blue jeans. (Id. at 822-23.) Nonetheless, a few days later, she picked Anthony Brown's photo out of a photo spread indicating he was the shooter. (Id. at 837.) Ms. Rorie also made an in-court identification of Mr. Brown as the person who shot her mother. (Id. at 850.) She testified on cross-examination by the Commonwealth that she did not correct her initial statement to the police because she wanted her boyfriend to kill Mr. Brown. (Id. at 860.)
> Petitioner's alibi defense consisted of several witnesses. Terrence Devero, who

was alleged to be one of the other men at the corner of Girard and Conestoga when the shooting erupted, testified that he was at his mother's home at the time of the incident. (N.T. 9/26/00 at 762.) While the time line he presented for the day of the shooting was impeached by the Commonwealth, his testimony was corroborated by his mother, Lauren Woodson. (Id. at 783.)

Lynnette Bright testified that she was the college roommate of Tiyana Miller, Mr. Brown's cousin. Ms. Bright testified that, on the day of the murder, she and Ms. Miller went to the TGI Friday[']s restaurant at 17th Street and the Benjamin Franklin Parkway, to buy some take-out food for dinner, arriving at approximately 7:30 p.m. (N.T. 9/27/00 at 930.) Ms. Bright testified that approximately fifteen minutes after they arrived Miller saw her cousin, Anthony Brown, walking from the interior of the restaurant toward the front of the restaurant. (Id. at 930.) They spoke for a while, then Brown cut the conversation short because his food had arrived at his table. (Id. at 931.) Ms. Bright testified that she and Miller were seated at the front of the restaurant near the door and could see who came in and left. (Id. at 932.) She testified that they waited a considerable amount of time to get their take-out order, and left the restaurant sometime between 8:15 and 8:20 p.m. During that time, she had not seen Mr. Brown leave. (Id.)

On cross-examination, Ms. Bright was impeached with evidence that she knew several of Brown's relatives, with inconsistent statements regarding the time that she arrived at the restaurant, and with her asserted failure to cooperate with the District Attorney's investigation. (Id. at 939-956; 961-67.) She was also unable to describe the clothing that Mr. Brown was wearing. (Id. at 957.) Finally, she reputed [sic] part of the statement she had given to a defense investigator. In the statement she asserted that she saw Mr. Brown with a few of his friends and saw him still eating at his table when she left. She admitted, however, that she did not actually see him seated at a table with his friends at any time that she was in the restaurant. (Id. at 972-73.)

Tiyana Miller testified that she arrived home from work on the day of the murder between 6:45 and 7:00 p.m. and went to the TGI Friday[']s restaurant between 7:15 and 7:30 p.m. (Id. at 977-78.) She remembered that it was already dark when they walked to the restaurant. (Id. at 978.) She and Ms. Bright then waited 15 to 20 minutes to place their take-out order. (Id.) While they waited, she saw her cousin Anthony Brown come out to the entrance area to use the telephone. (Id. at 979.) She recalled chatting with him. (Id.) Miller testified that they waited approximately one hour for their take-out food, leaving the restaurant at approximately 8:20 p.m. (Id.) She stated that Brown was still in the restaurant when they left, seated with Black Anthony, Kevin Johnson, and two women, eating their dinner. (Id. at 979-80; 982.)

When she learned that Mr. Brown had been arrested for the murder, she went

back to the TGI Friday[']s to find out if they had a video surveillance system that could pinpoint the time that Brown left the restaurant. (Id. at 980-81.) However, on cross examination, Ms. Miller was impeached with evidence that she never contacted any member of her family after she learned of her cousin's arrest to let them know she had seen him on the night of the murder. (Id. at 990-94.) She also did not contact the police with her information, and did not respond to letters from the district attorney. (Id. at 1006-07; 1011-13.) She also could not describe what clothing Mr. Brown was wearing at the restaurant. (Id. at 997.)

Petitioner Brown testified in his own defense. He told the jury that on September 7, 1998 he was driving to the TGI Friday[']s restaurant located on City Line Avenue in Philadelphia when he was stopped for a traffic violation. (Id. at 1015.) The citation lists the time of the traffic stop as 6:41 p.m. (Id. at 1016.) [The parties stipulated that he was released by the officer at 6:46 p.m.. N.T. 1196.] Mr. Brown testified that he gave the officer an alias and an incorrect address because he was a traffic scofflaw and feared being arrested if he gave his correct information. (Id. at 1038.) When he arrived at the City Avenue location with Kevin Johnson, Black Anthony and three women they had met that afternoon at a radio station-sponsored baseball game, the restaurant was quite crowded. (Id. at 1017-18.) They then decided to go to the TGI Friday[']s location on the Parkway, driving back into town on the Schuylkill Expressway. (Id. at 1019.) He testified they arrived at approximately 7:10 to 7:15 p.m. and had to wait to be seated. (Id.) They were eventually seated at a booth in the bar area. (Id.) After they were seated, he saw his cousin, Tiyana Miller near the door with her roommate. (Id. at 1021.) He walked over to talk to her briefly before his food arrived, but did not see her leave. (Id. at 1021-22.) He testified that he left the restaurant at 8:45 p.m. (Id. at 1023.)

Mr. Brown testified that, after paying the check and leaving the restaurant, he, Black Anthony and Kevin Johnson drove to Johnson's automotive detail shop located at 59th and Race Streets, where they spent about ten minutes. (Id. at 1022.) He then drove home to Girard Avenue where he saw police cars at the corner of Girard and Conestoga. (Id. at 1023.) The police arrested Black Anthony and Kevin Johnson after Timmsel Rorie identified them to the police as the assailants. (Id. at 1025- 29.[)] He only discovered later in the week that there was a warrant for his arrest as well. (Id. at 1029.)

Kevin Johnson also testified for the defense. He stated that the party arrived at the TGI Friday[']s restaurant on the Parkway while it was still daylight. (Id. at 1043.) He could not state the time with any certainty, but testified it was before 7:00 p.m. (Id.) He stated that they left after it was dark. (Id.) Johnson testified that the restaurant was not crowded and that the group was seated without waiting. (Id. at 1172.) He also testified that they were seated on the second floor of the

restaurant, not in the bar area. (Id. at 1173.)

R&R 4-10.

## C.    Conviction, Appeal, and State Postconviction Proceedings

At the conclusion of the trial:

Petitioner, despite his alibi evidence, was convicted of all charges. In post-trial motions, Mr. Brown argued that the evidence was insufficient to sustain the convictions, the verdict was contrary to the weight of the evidence, the trial court erred in excusing a juror during the trial, the trial court improperly prohibited Brown from presenting alibi evidence, and trial counsel, Tariq El Shabazz, was ineffective for failing to object to the prosecutor's eliciting evidence that Brown was a scofflaw, and for failing to request a jury instruction on voluntary manslaughter. (Resp. Ex. B at 7.) After the post-trial motions were denied, Brown filed a direct appeal in which he raised as issues that:

1. Trial counsel was ineffective for:
    a. failing to timely file a notice of intent to present two additional alibi witnesses;
    b. failing to request a jury instruction that the identification testimony should have been viewed with caution;
    c. failing to object to the trial court giving an incomplete instruction on alibi;
    d. failing to object to or move to exclude evidence of prior crimes and bad acts committed by Brown, his witnesses and his co-conspirators;
2. The trial court erred in:
    a. failing to give the jury instruction on identification testimony;
    b. giving an incomplete instruction on the alibi defense because it failed to instruct that the Commonwealth retained the burden of proof;
3. The prosecutor improperly vouched for the credibility of Commonwealth witnesses in his closing argument and discussed facts not in evidence; and
4. The cumulative effect of these errors deprived Brown of a fair trial.

(Resp. Ex. C at 3-4.) The Pennsylvania Superior Court, in an opinion filed May 30, 2003, affirmed the judgment of conviction finding that all the issues Mr. Brown raised were properly couched in terms of ineffective assistance of counsel.[Footnote omitted] Rather than address such claims on direct appeal, the Superior Court dismissed the claims without prejudice to Mr. Brown's right to

raise them on collateral review. (Resp. Ex. D. at 6-7.)

Nearly eleven months later, on April 21, 2004, Brown filed a counseled Petition under the Pennsylvania Post-Conviction Relief Act, 42 Pa. Con. Stat. Ann. 9541, raising the same issues dismissed without prejudice by the Superior Court on direct appeal. (Resp. Ex. E.) He later filed a Supplement to the Petition raising as an additional issue that trial counsel was ineffective for failing to present the exculpatory testimony of an alleged eye witness to the shooting, Malik Easley.

Attached to the PCRA Petition were two witness statements and three affidavits further supporting Brown's alibi defense claim. In one statement, dated October 2, 2000, Andre Osborne, a former law enforcement officer in the military, averred that he was working as a manager at the TGI Friday's restaurant on the day of the shooting and observed Mr. Brown with two other men and some young women seated at Table 307. He remembered them because they were being loud and he suspected they might leave without paying their bill. He could not state with certainty when the group left, other than he knew the sun had already set. In the other statement, which is dated March 28, 2001, Stacy Szmyt averred that she worked as a bartender and waitress at the restaurant, and vaguely remembered working Table 307 where a rowdy group was seated because she feared they would leave without paying. She offered no information about when the party left the restaurant.

Arthur Boyer, Petitioner's father, signed an affidavit attesting that he told Mr. Brown's trial counsel on a number of occasions prior to the trial that alibi witnesses were available and asked if he had interviewed the waitress at the restaurant. Boyer averred that counsel told him "he was working on it." In his own affidavit, Petitioner averred that he informed trial counsel of his alibi at the time he retained him, and several times thereafter gave counsel the names of his dining companions and told him that their waitress was named Stacy. Brown averred that he knew counsel never interviewed one of the diners; that although counsel hired an investigator to gather evidence, the investigator did not complete his work because counsel never paid him his fee; and that counsel hired a new investigator on the eve of trial who was able to track down the waitress and her manager.

Finally, Mr. Brown attached the affidavit of the second investigator, Brian Grevious, who stated that he was retained by counsel three days prior to the start of the trial. According to Grevious, Mr. Brown told him that counsel had not visited him during the two years that Petitioner was in pre-trial detention and that he had advised counsel repeatedly in letters and through his father that there was a waitress who could provide an alibi. In its subsequent order, the PCRA Court dismissed these claims as well because they were not included in the original Petition and thus were not properly within the scope of the appeal. (Resp. Ex. F at 5.) Mr. Grevious averred that he was able to locate Mr. Osborne and Ms. Szmyt

and take the two witness statements. Grevious averred that counsel seemed surprised by the existence of the witnesses. Mr. Grevious opined that counsel was completely unprepared to try the case, lacked familiarity with the basic facts of the case, and did not perceive inconsistencies in the identification evidence, including that the shooter was described in the initial flash message broadcast to responding police officers as a full foot shorter than Mr. Brown. [Footnote omitted]

In an opinion filed June 6, 2005, the PCRA court, after first giving Brown notice of its intent to do so, dismissed the Petition without a hearing. [Footnote omitted] (Resp. Ex. F at 5-17.) Citing the United States Supreme Court decision in Strickland v. Washington, 466 U.S. 668 (1984), as well as state law precedents on the issue of constitutionally ineffective assistance of counsel, the PCRA Court determined that Mr. Brown's ineffective assistance claim arising from counsel's failure to file a notice of alibi defense was meritless. The Court determined that the trial record revealed that counsel did not learn of the two putative alibi witnesses until sixth day of trial. It concluded that counsel could not be deemed ineffective because the existence of the witnesses were never disclosed to him. (Resp. Ex. F at 7.) The Court added that Stacey Szmyt could not identify Mr. Brown or state when he left the restaurant, Andre Osborne also could not state with specificity when Mr. Brown left the restaurant, and, even if the testimony of the two was relevant, it would have been cumulative of Petitioner's own testimony, as well as that of several of his other witnesses, rendering it unnecessary. (Id. at 8.)

R&R 10-15.

Petitioner appealed to the Pennsylvania Superior Court. R&R 15. On April 9, 2007, the Superior Court affirmed. Id. With respect to the failure to file notice of alibi witnesses, the Superior Court rejected petitioner's arguments for the reasons articulated by the PCRA court. The Superior Court found that petitioner failed to show that the alibi witnesses were "available in court and prepared to cooperate, or that the absence of their testimony prejudiced" petitioner. Com. Ct. Op. at 10. The court further found that, even if Shabazz had been aware of the witnesses, the testimony of Szmyt and Osborne would not have been helpful because it would have been "merely cumulative." Com. Ct. Op. at

11-12.

**D.     Evidence Presented at the Hearing Before Judge Rapoport**

On March 19, 2007, while petitioner's appeal in Superior Court was pending, he filed the present petition. R&R 15. Following the Superior Court's affirmance of the PCRA court, Judge Rapoport appointed counsel for petitioner and conducted a two-day evidentiary hearing. R&R 21. At this hearing, witnesses testified about the investigation, or lack thereof, done by Shabazz in preparation for petitioner's trial.

Based on testimony at the hearing, the R&R found that Shabazz initially hired Billy Padden to investigate, but that Padden "did not turn over his investigation file," evidently because "he was not paid for his work." R&R 29. Thus, petitioner did not benefit from any investigation that Padden may have conducted.

Brian Grevious testified at the evidentiary hearing that he was then hired by Brown's counsel as a private investigator "less than one week before the start of trial." *Id.* By the time he was able to get in contact with Szmyt and Osborne, the Commonwealth had rested and the defense was putting on its case. R&R 21-22. Grevious informed Shabazz about the witnesses the night before he brought them to court. R&R 22. The R&R found that the witnesses were "ready and willing to testify." *Id.*

Osborne's testimony at the evidentiary hearing mirrored the account in his witness statement. Osborne stated that he remembered petitioner because he was worried that

petitioner's group might not pay their bill. Transcript of Evidentiary Hearing of Nov. 17, 2009, at 25-28. He also remembered that petitioner got up from the table several times, that he had to ask the group to keep the noise down, that petitioner's group did pay their bill, and that it was dark out when petitioner's group left. *Id.* Stacy Szmyt[3] also testified. However, she testified that her prior statements were her recollections of the events of that night at the time, but that she could "[n]ot really" recall the events at the time of the evidentiary hearing. Transcript of Evidentiary Hearing Dec. 15, 2009, at 10.

At the evidentiary hearing, Shabazz admitted that he had failed to submit a notice of alibi concerning Osborne and Szmyt, and an additional witness, Malik Easley.[4] R&R 25. As a result, Osborne and Szmyt were precluded from testifying by the trial court. R&R 25-27. Shabazz stated that as a strategic measure he would not have called Easley to testify regardless of the notice of alibi, but that the failure to file the notice with regard to Szmyt and Osborne affected his summation. R&R 27-28.

The Commonwealth also submitted additional evidence. Philadelphia Police Detective John McDermott stated that he had driven the route from the TGI Friday's restaurant to the corner of Girard and Conestoga described by petitioner at his trial and

---

[3] In the intervening years she married and is now Stacy Wessel.

[4] Easley would, if called at trial, have testified that he was present at the scene during the murder and, while he did not clearly see the shooting, petitioner Brown did not match what he saw of the assailant. R&R 24. However, Shabazz stated that he would not have called Easley as Easley's testimony would have corroborated some details of the descriptions of the shooter given by prosecution witnesses and would have placed a car similar to petitioner's at the scene. R&R 28.

14

the trip took twenty-one minutes in moderate traffic. R&R 30. Adding a diversion to the auto detail shop added one to two minutes to the total drive time. *Id.* Detective McDermott also determined that the sun set on September 7, 1998 at 7:23 p.m. and the end of civil twilight was 7:50 p.m. R&R 30-31. Thus, Osborne's testimony that petitioner left when it was "dark" out would, if true, place the time that petitioner left between 7:23 and 7:50, at the earliest, as it could not have been dark out earlier than sunset.

## II. DISCUSSION

The R&R recommends granting petitioner's habeas corpus petition based on counsel's ineffectiveness for failing to investigate the existence of alibi witnesses and for failing to file a notice of alibi witness for Osborne and Szmyt. The R&R states that counsel's deficient performance prejudiced the defense, thereby satisfying both prongs of *Strickland*. The R&R observes that the Commonwealth's "evidence of guilt was hardly overwhelming" as no murder weapon was produced and descriptions of the assailant were not consistent. The R&R also states that Osborne would have been the only disinterested witness testifying that Brown left the restaurant at night, and so his testimony would have corroborated the testimony of Bright and Miller, who were impeached based on their relationship to the defendant.

### A.    Objections to the R&R's Factual Findings

The R&R's factual findings both supplement the state court's findings and lead to

the conclusion that certain key factual findings made by the state court were unreasonable. The R&R finds that the PCRA court erred in finding that Osborne's proposed testimony could not have placed petitioner in a different location at the time of the shooting and thus would have been "useless." The Commonwealth argues that the R&R is in error in finding that Osborne's testimony would aid petitioner in establishing an alibi, as such testimony does not necessarily lead to the conclusion that petitioner was elsewhere at the time of the murder. In addition, the Commonwealth claims that the R&R embellishes the proposed testimony of Osborne.

I find that the R&R was correct in ruling that the state court was in error in finding that the excluded testimony of Osborne would have been "useless."[5] Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the petitioner bears the burden of rebutting the state court's finding:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1); *cf. Lewis v. Horn*, 581 F.3d 92, 111 n.12 (3d Cir. 2009) ("[Section] 2254(e)(1) contemplates a challenge to the state court's individual factual

---

[5] One could arguably construe this finding as either a finding of fact regarding the nature of Osborne's testimony or as a finding of law regarding whether petitioner was prejudiced by the exclusion of such testimony. Either way it is construed, the PCRA court unreasonably found that Osborne's testimony would have been useless to petitioner's alibi defense. *See* Part B.2 *infra*.

determinations, including a challenge based wholly or in part on evidence outside the state trial record.").  An evidentiary hearing is not barred by 28 U.S.C. § 2254(e)(2) if the petitioner sought and was denied a hearing in state court, because § 2254(e)(2) only limits evidentiary hearings when the petitioner "failed to develop the factual basis of a claim." *See Boyd v. Waymart*, 579 F.3d 330, 359 (3d Cir. 2009) ("That the state court may have made a finding of fact does not preclude the requirement of a hearing in the federal habeas court if no hearing was granted in the state court.").

The PCRA court found that Osborne's testimony "could not provide an alibi and [his] testimony would be useless."  PCRA Ct. Op. 8.  However, testimony from a disinterested witness that it was "dark" outside when petitioner left the restaurant could provide an alibi and would not have been useless.  Sunset that day was at 7:23 p.m. and the end of civil twilight was at 7:50 p.m..  R&R 30-31.  Thus, "dark" could reference a period starting, at the earliest, sometime between 7:23 p.m. and 7:50 p.m..  Both the R&R and the Commonwealth focus on 8:23-8:24 p.m., when the police radio call of the shooting occurred as an approximation of when petitioner would have had to reach the scene of the shooting to have committed the murder.  However, the Commonwealth's evidence at trial and theory of the case required petitioner to be at the scene earlier. Yvonne Rorie testified that she saw Kareema meet with petitioner and point down the block 15 to 20 minutes before the shooting.  N.T. 620.  The PCRA court states that the facts found by the jury were that Kareema and petitioner had a "short conversation" and

17

"[a]pproximately twenty minutes later" the shooting occurred. PCRA Ct. Op 4. Thus, petitioner, based on the prosecution's evidence, needed to have been at the scene at about 8:00 p.m..

For petitioner to have made it to the scene of the shooting by 8:00 p.m. he would have had to leave the restaurant before the end of twilight. At trial, petitioner testified the drive from TGI Friday's to the garage took 15 minutes. N.T. 1031-31. He also testified that he spent ten minutes at the automotive detail shop. N.T. 1022. At the evidentiary hearing before Judge Rapoport, Detective McDermott said a similar trip took him 21 minutes in weekday traffic. With a fifteen-minute drive and a ten-minute stop, in order to arrive at the scene of the shooting petitioner would have had to leave the TGI Friday's at 7:35 p.m., a mere ten minutes after sunset. Even without crediting petitioner's testimony about the stopover, petitioner would have had to leave the restaurant by approximately 7:45 p.m., a time within twilight. As Osborne testified at the evidentiary hearing that "it wasn't light out . . . it was definitely dark outside," Transcript of Evidentiary Hearing of Nov. 17, 2009, at 27, a jury could have concluded from Osborne's testimony, had it been presented at trial, that petitioner did not leave until twilight had ended, 7:50 p.m., a time when petitioner would likely have been unable to reach the scene of the crime in sufficient time to meet with Kareema Latimer. The statement that it was "dark" out also provides corroboration to Miller's, Bright's, and petitioner's testimony at trial that petitioner did not leave the restaurant until after 8:15 p.m., a time when it would have

clearly been dark out.

Thus, contrary to the state court's finding, Osborne's testimony would not have been "useless" as it both provided unbiased corroboration of petitioner's and other alibi witnesses' accounts and the testimony would have allowed the jury to draw the inference that petitioner left the TGI Friday's at a time when he could not have traveled to the scene of the shooting.

The Commonwealth further objects to the R&R's statement that: "[Osborne] testified that he could see that it was dark outside when the party left the restaurant; specifically he recalled that it was nighttime, not just twilight." R&R 23. While the R&R's statement is a fair characterization of Osborne's testimony, Osborne never used the term "twilight." The relevant portion of his testimony states:

Q   Okay was it pitch dark or trying to – how would you explain dark?
A   It was definitely night time, dark.  It wasn't – it wasn't light out.  It wasn't –
Q   Okay
A   – it was definitely dark outside.

Transcript of Evidentiary Hearing of Nov. 17, 2009, at 27.  I do not adopt the finding of the R&R that attributed to Osborne the phrase "not just twilight."

The Commonwealth also objects to the R&R's determination that the PCRA court unreasonably found that Shabazz did not learn of Osborne and Szmyt until the sixth day of trial.  Shabazz maintained at trial (N.T. 909-10) and at the evidentiary hearing (Transcript of Evidentiary Hearing of Dec. 15, 2009, at 31-32) that he was not aware of the witnesses until after trial had started.  The PCRA court credited his testimony.  PCRA

Ct. Op. at 7. The R&R finds that petitioner has rebutted this finding by "clear and convincing evidence" based on affidavits submitted by petitioner, petitioner's father, and Grevious. R&R 32.

There are substantial questions regarding whether the PCRA court's finding should stand. Affidavits of the sort relied on by the R&R are unlikely to constitute the clear and convincing evidence needed to rebut the state court's finding. *See, e.g.*, *Avila v. Quarterman*, 560 F.3d 299, 307 (5th Cir. 2009) ("This affidavit, which was not executed until long after the trial, does not constitute clear and convincing evidence sufficient to rebut the presumption of correctness afforded the state court's finding under § 2254(e)(1)."). However, the Superior Court, on appeal from the PCRA court, appears to have subscribed in some measure to the facts stated in affidavits. In particular, the Superior Court, on the basis of the Boyer affidavit, seems to have questioned the factual finding of the PCRA court that counsel was unaware of the witnesses before trial:

> While the affidavits of Mr. Osborne and Ms. Szmyt indicate they existed and *that of Arthur Boyer suggests trial counsel was aware of their existence*, none of the affiants aver, or prove, that they were available to testify in court and prepared to cooperate, or that the absence of their testimony prejudiced Appellant.

Super. Ct. Op. at 10 (emphasis added). The Superior Court's opinion was not unequivocal; it also stated that Grevious's affidavit "suggest[s] the identity of Mr. Osborne and Ms. Szmyt was not made available to trial counsel so that he could file a timely alibi notice." Super. Ct. Op. at 11.

However, I need not decide the issue of what weight, if any, should be given to the

20

finding that Shabazz was not aware of the existence of the witnesses. Even if Shabazz was not subjectively aware of the witnesses, if it is the case that he should have been aware of them, that would lend support to petitioner's argument that Shabazz provided inadequate representation.

The findings of the R&R do not contradict the PCRA court's finding that Shabazz was not subjectively aware of the witnesses, but rather establish that an effective attorney in the position of Shabazz should have become aware of the witnesses. The PCRA court merely made a determination that Shabazz was not actually aware of the witnesses. The notes of testimony relied on by the state court only mention that Shabazz had not "found" the witnesses until the sixth day of trial. N.T. 909-10. The R&R's finding that, based on statements in the affidavits, Shabazz was told that restaurant employees might be able to confirm petitioner's account, is a determination that Shabazz *should have been aware* that there might be disinterested alibi witnesses and should, therefore, have investigated that possibility. *See* R&R 32-33; Transcript of Evidentiary Hearing of Dec. 15, 2009, at 19-22 (Testimony of Petitioner) (stating that he told Shabazz that the waitress at the restaurant could corroborate his story). Shabazz did not have an investigator try to find the employees working that night until less than a week before voir dire. Transcript of Evidentiary Hearing of Nov. 17, 2009, at 13 (Testimony of Brian Grevious). As discussed below, this failure to investigate can constitute ineffective assistance of counsel.

I reject the R&R's finding to the degree that it found that Shabazz was subjectively aware of the witnesses before the start of trial. However, I find, consistent with the R&R, that Shabazz should have been aware of the witnesses sufficiently in advance to file a proper notice of alibi witnesses for them.

I also supplement the R&R in another significant respect. The R&R found that Osborne and Szmyt were "ready and willing to testify." R&R 22. However, this finding conflicts with the Superior Court's finding that "none of the affiants [including Osborne and Szmyt] aver, or prove, that they were available to testify in court and prepared to cooperate." Super. Ct. Op. 10. I conclude that the Superior Court's finding was unreasonable. The trial court transcript reflects that Osborne and Szmyt were present outside the courtroom ready to testify when Shabazz attempted to call them to testify. N.T. 922-25. The testimony of Shabazz, Grevious, Osborne, and Szmyt at the evidentiary hearing includes statements that the witnesses were present to testify at the trial of petitioner. Transcript of Evidentiary Hearing of Nov. 17, 2009, at 19, 27; Transcript of Evidentiary Hearing of Dec. 15, 2009, at 6, 35. Given the foregoing, I conclude that the Superior Court's finding was unreasonable.

The bulk of the Commonwealth's remaining objections to the R&R's factual findings address whether the R&R should have made inferences in favor of petitioner.[6] It

---

[6] Namely, the Commonwealth objects to the R&R (1) equating the end of civil twilight with Osborne's testimony it was "dark" out, (2) assuming that it took petitioner twenty-one minutes to drive from the restaurant to the scene, and (3) not crediting or

was not error for the R&R to address the potential inferences, as the crucial question was whether Osborne's testimony could have been useful, had it been presented at trial. It was appropriate to consider the inferences that a jury could, but was not required to, draw in petitioner's favor in deciding how useful Osborne's testimony could have been. It was also appropriate to consider the credibility of certain testimony, in light of Osborne's testimony, when determining the potential impact of such testimony. Thus, the R&R is not in error when considering what favorable inferences could be made in light of Osborne's testimony.

**B.    Objections to the R&R's Conclusions of Law**

Under AEDPA a petitioner must demonstrate that, if the state court adjudicated the merits of a claim, the adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States." *Penry v. Johnson*, 532 U.S. 782, 792 (2001) (quoting 28 U.S.C. § 2254(d)(1)). A decision is deemed to be on the merits of a federal claim and entitled to deference, even if state law is also addressed, when the state court's reasons for denying the federal claims "fairly appear to rest primarily on federal law or to be interwoven with federal law." *Coleman v. Thompson*, 501 U.S. 722, 735 (1991).

A state-court decision is an "unreasonable application of" Supreme Court precedent if the court "correctly identifies the governing legal rule but applies it

---

choosing to credit certain witnesses.

unreasonably to the facts of a particular prisoner's case." *Penry*, 532 U.S. at 792 (quoting *Williams v. Taylor*, 529 U.S. 362, 407-08 (2000)). In evaluating Brown's PCRA petition, the PCRA court correctly identified *Strickland v. Washington*, 466 U.S. 668 (1984), as the governing law on constitutional ineffectiveness of counsel,[7] despite ultimately applying a test developed by the state courts. Thus, to prevail, petitioner must show that the PCRA court unreasonably applied *Strickland*.

Under *Strickland*, for a petitioner to successfully argue ineffective assistance of counsel, he must demonstrate that (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defense. 466 U.S. at 687. In assessing petitioner's claim of ineffective assistance of counsel, I "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. I must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690.

I find the PCRA court's application of *Strickland*, and the Superior Court's affirmance, unreasonable.[8] The PCRA court correctly identified the controlling United

---

[7] On appeal, the Superior Court affirmed the PCRA court without mentioning *Strickland*. However, the Supreme Court has held "that a state court need not even be aware of our precedents, 'so long as neither the reasoning nor the result of the state-court decision contradicts them.'" *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003) (quoting *Early v. Packer*, 537 U.S. 3, 8 (2002)).

[8] The following is the PCRA court's discussion of the failure to file the notice of alibi witnesses:

"Ineffective assistance of counsel is a mixed question of law and fact that we

review *de novo*." <u>United States v. Blaylock</u>, 20 F.3d 1458, 1465-[6]5 (1994).  The United States Supreme Court in <u>Strickland v. Washington</u>, 466 U.S. 668, 685 (1984), stated, "The Constitution guarantees a fair trial through the Due Process Clause, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment including the Counsel Clause."  The Supreme Court also states, "That a person who happens to be a lawyer is present at trial alongside the accused, however, is not enough to satisfy the constitutional command.  The Sixth Amendment recognizes the right to assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results.  An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair."  <u>Id.</u>  Due to the reason above, the Supreme Court has acknowledged that the right to counsel is the right to effective counsel.  <u>Id.</u> at 686.  The law presumes that counsel was effective and, therefore Appellant had the burden to show that counsel was ineffective.  <u>Commonwealth v. Baker</u>, 614 A.2d 663, 673 (Pa. 1993).

The <u>Strickland</u> Court set out a test where a defendant would have to show that (1) his attorney's performance was unreasonable under prevailing professional standards and (2) that there is a reasonable probability that but for counsel's unprofessional errors; the result would have been different.  <u>Strickland v. Washington</u>[, 466 U.S.] at 687-90.  In reviewing the PCRA, the Pennsylvania Supreme Court, in <u>Commonwealth v. Douglas</u>, 645 A.2d 226, 230 (Pa. 1994), stated, "To prevail on such a claim, Appellant must demonstrate that (1) the underlying claim is of arguable merit; (2) counsel's course of conduct was without a reasonable basis designed to effectuate his interest; and (3) that he was prejudiced by counsel's ineffectiveness."  To show prejudice defendant must establish that, but for counsel's errors, the outcome of the trial would have been different.  <u>Commonwealth v. Bond</u>, 819 A.2d 33 (Pa.2002).  Appellant's failure to satisfy all the prongs of the test should result in the dismissal of the ineffective counsel claim.  <u>Commonwealth v. Fulton</u>, 876 A.2d 342 (Pa. 2003).

To be entitled to an evidentiary hearing on a claim of ineffectiveness, a defendant must "set forth an offer to prove at an appropriate hearing sufficient facts upon which a reviewing court can conclude . . . counsel may have, in fact, been ineffective."  <u>Commonwealth v. Priovolos</u>, 715 A.2d 420, 422 (Pa. 1998) (quoting <u>Commonwealth v. Pettus</u>, 424 A.2d 1332, 1335 (Pa. 1981)).  As the facts present no basis for ineffectiveness, no hearing was necessary.

Appellant first alleges that trial counsel was ineffective for failing to file a timely notice of intent to present alibi witnesses.  In order to succeed on a claim of

States Supreme Court precedent of *Strickland*. PCRA Ct. Op. 5-6. However, the court

did not apply this standard but rather applied a specialized standard developed by

---

ineffectiveness for failing to call witnesses, Appellant must demonstrate the following: (1) that his trial counsel knew or should have known about the witnesses; (2) that [the] witnesses would have provided material evidence at the time of the trial and that the witnesses would have been helpful to his case; (3) and that the proposed witnesses were available for trial and that the proposed testimony was truly necessary. Commonwealth v. Fetter, 770 A.2d 762 (Pa. Super. [Ct.] 2001).

The record reveals that defense counsel did not file a notice of alibi with respect to witnesses Osborne and Smzyt [sic] because he only learned of their existence on the sixth day of trial, when his newly hired private investigator allegedly discovered them (N.T. 9/27/00, 909-10, 922). Counsel, therefore, could not be deemed ineffective because the existence of witnesses were never disclosed to him. Commonwealth v. Elliot, 466 A.2d 666 (Pa. Super. [Ct.] 1983).

Furthermore, the statements that Appellant produced along with his Motion in Arrest of Judgment, filed on July 16, 2001, indicate that Szmyt, a waitress on duty at Friday's restaurant on the evening of the murder on September 7, 1998, could not identify Appellant or say anything regarding his whereabouts on the night of the murder. In addition, Osborne, a manager at Friday's restaurant, claimed to remember that Appellant was a patron in his restaurant years previously, but he could not remember at what time in the evening Appellant was present in the restaurant. Since neither witnesses could place Appellant "at the relevant time in a different place that [sic] the scene involved," they could not provide an alibi and their testimony would have been useless. For that reason trial counsel will not be deemed ineffective for failing to file an alibi notice to call unhelpful witnesses. Commonwealth v. Johnson, 646 A.2d 1170, 1172 (1994).

Finally, even if the testimony of these witnesses were relevant, it would have been cumulative of other testimony. Appellant testified to an alibi placing him at Friday's restaurant at the time the murder occurred. This alibi was repeated in the testimony of three other witnesses–Lynette Bright, Tiyanna Miller, and Kevin Johnson (N.T. 9/27/00, 928-1054; N.T. 9/28/00, 1054-1191). The testimony's cumulative effect renders it unnecessary, thus "counsel could not be deemed ineffective for failing to call witnesses whose testimony would be cumulative." Commonwealth v. Milligan, 693 A.2d 1313, 1319 (Pa. Super. [Ct.] 1997).

PCRA Ct. Op. at 5-8

Pennsylvania state courts for failure to file notice of intent to present alibi witnesses. *Id.* at 7. The PCRA court required petitioner to show that "(1) his trial counsel knew or should have known about the witnesses; (2) that [the] witnesses would have provided material evidence at the time of the trial and that the witnesses would have been helpful to his case; and (3) that the proposed witnesses were available for trial and that the proposed testimony was truly necessary." *Id.*

On appeal from the PCRA Court, the Superior Court failed to identify *Strickland* and instead applied a different state-law, five-part test for ineffective assistance of counsel.[9] The Superior Court required that "(1) the witness existed; (2) the witness was

_____

[9] The Superior Court's discussion follows:

Appellant initially asserts trial counsel was ineffective for failing to file a timely alibi notice. To prevail on a claim of trial counsel's ineffectiveness for failure to call a witness, Appellant must prove (1) the witness existed; (2) the witness was available to testify in court; (3) trial counsel was informed of the existence of the witness or should have known of the witness's existence; (4) the witness was prepared to cooperate and would have testified on Appellant's behalf; and (5) the absence of testimony prejudiced the petitioner. ***Commonwealth v. Chmiel***, 585 Pa. 547, 622, 889 A.2d 501, 545-46 (Pa. 2005).

Herein, Appellant attached four (4) affidavits to his PCRA petition.[FN omitted] The first two were from Andre Osborne and Stacy E. Szmyt, two putative witnesses who were working in the TGI Friday's in which Appellant claimed to have been at the time of the murder. The third was completed by Brian Grievous [sic], the private investigator hired by trial counsel to interview them. The last affidavit was from Arthur Boyer, Appellant's father. While the affidavits of Mr. Osborne and Ms. Szmyt indicate they existed and that of Arthur Boyer suggests trial counsel was aware of their existence, none of the affiants aver, or prove, that they were available to testify in court and prepared to cooperate, or that the absence of their testimony prejudiced Appellant. These omissions are fatal to Appellant's claim. ***See Commonwealth v. Fetter***, 770 A.2d 762, 770 (Pa. Super[.

available to testify in court; (3) trial counsel was informed of the existence of the witness

---

Ct.] 2001) (failure to demonstrate that witnesses were available or willing to testify is fatal to ineffectiveness claim).

In his own affidavit dated April 7, 2004, Appellant claims that he informed trial counsel [that] a restaurant waitress named Stacy "might remember [him]." *See* Affidavit/Declaration of Appellant at 1. Nevertheless, in his affidavit dated April 16, 2004, Mr. Grievous [sic] indicates trial counsel contacted him "three days before the trial started" and "[a]ll of this investigation of theses witnesses took place after [Appellant's] trial began. *See* Affidavit/Declaration of Brian Grievous [sic], Page 2. These statements suggest the identity of Mr. Osborne and Ms. Szymt was not made available to trial counsel so that he could file a timely alibi notice.

Even had trial counsel known of these individuals' existence prior to trial, Mr. Osborne, a manager at TGI Friday's restaurant, did not indicate at what time in the evening Appellant was present in the restaurant, nor could Mr. Osborne recall the time Appellant's party left, though he said he recognized Appellant as one of the individuals at table #307 when he saw him in the courtroom. *See* Affidavit/Declaration of Brian [sic] Osborne, 10/2/00. Also, Ms. Szymt did not specifically identify Appellant as a customer and stated that she "vaguely" recalled waiting on the group of individuals seated at table #307 on September 7, 1998 (Labor Day). *See* Affidavit/Declaration of Stacy Szmyt, 3/28/01.

Finally, the trial court aptly explained why any testimony offered by Mr. Osborne and Ms. Szymt would have been cumulative of other testimony presented at trial:

Appellant testified to an alibi placing him at Friday's restaurant at the time the murder occurred. This alibi was repeated in the testimony of three other witnesses–Lynette Bright, Tiyanna Miller, and Kevin Johnson (N.T. 9/27/00, 928-1054; N.T. 9/28/00, 1054-1191). The testimony's cumulative effect renders it unnecessary, thus "counsel could not be deemed ineffective for failing to call witnesses whose testimony would be cumulative." *Commonwealth v. Milligan*, 693 A.2d 1313, 1319 (Pa. Super. [Ct.] 1997).

Trial Court Opinion 6/6/06 at 8. As an appellant is not prejudiced by the failure of trial counsel to present merely cumulative evidence, an appellant's claim of ineffective assistance of counsel on this basis must fail. *Commonwealth v. Spotz*, 587 Pa. 1, 896 A.2d 1191, 1229 (2006).

Superior Court Op. at 9-12.

or should have known of the witness's existence; (4) the witness was prepared to cooperate and would have testified on Appellant's behalf; and (5) the absence of testimony prejudiced the petitioner." Super. Ct. Op. 9-10. While the failure to mention *Strickland* is not, by itself, grounds for finding an unreasonable application, if the reasoning or result contradicts the dictates of *Strickland*, the Superior Court acted unreasonably. *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003).

1.   **The State Courts' Determination that Counsel's Performance was Sufficient was an Unreasonable Application of** *Strickland*

The use of the tripartite standard by the PCRA and the Superior Court's affirmance using a similar five-part test was an unreasonable application of the standard established by the Supreme Court in *Strickland.* The state courts erred in the application of the standard for determining whether counsel's performance was effective and the standard for determining whether petitioner suffered prejudice.

The first prong applied by the PCRA court[10]–whether counsel "knew or should have known about the witnesses"–is not *a priori* a misapplication of *Strickland*'s requirement of reasonable professional assistance based on prevailing professional

---

[10] I do not address the Superior Court's opinion in regard to the performance of counsel. The Superior Court's reasons for denying petitioner's claim of ineffective assistance of counsel relied solely on factors that determine if he was prejudiced–namely, whether the witnesses were willing to cooperate and available to testify, whether their testimony would have aided petitioner's alibi defense, and whether their testimony was merely cumulative of other witnesses. Super. Ct. Op. 10-11.

standards. However, the PCRA court merely considered whether Shabazz subjectively knew of the witnesses' existence and it did not consider whether Shabazz's failure to investigate fell below the objective standard of professional conduct expected from him. In essence, the PCRA court failed to consider whether Shabazz, by taking appropriate investigative steps, should have known of the witnesses prior to trial.

The failure to make reasonable efforts to investigate an obvious line of defense constitutes ineffective assistance. *Rompilla v. Beard*, 545 U.S. 374, 383-390 (2005); *see also Bigelow v. Haviland*, 576 F.3d 284, 288 (6th Cir. 2009) ("An attorney's duty of investigation requires more than simply checking out witnesses that the client himself identifies."); *Clinkscale v. Carter*, 375 F.3d 430, 444 (6th Cir. 2004) ("[A] number of courts have found ineffective assistance where, as in this case, a defendant's trial counsel fails to file a timely alibi notice and/or fails to adequately investigate potential alibi witnesses."). This is particularly true given both the seriousness of the charge of first-degree murder, a crime for which petitioner could have been sentenced to death, and the defense's unmistakable need to establish petitioner's whereabouts at the time of the murder. *See Raygoza v. Hulick*, 474 F.3d 958, 964 (7th Cir. 2007) ("In a first-degree murder trial, it is almost impossible to see why a lawyer would not at least have investigated the alibi witnesses more thoroughly.").

Counsel provided ineffective assistance because reasonable steps were not taken to investigate petitioner's alibi until the eve of trial, resulting in the exclusion of witnesses

for failure to file a notice of alibi witnesses. Petitioner's only viable defense was an alibi defense coupled with impeaching the eyewitnesses who testified against him. Counsel was aware that the time petitioner left the TGI Friday's was a critical, if not *the* critical, fact that counsel needed to establish in petitioner's defense. Interviewing the employees of the restuarant would be an obvious and relatively easy means to provide corroboration of petitioner's account of events. *See Stewart v. Wolfenbarger*, 468 F.3d 338, 355-57 (6th Cir. 2007) (holding failure to contact residents of the house where petitioner claimed he was during the relevant time period to be objectively deficient performance).

Had Shabazz arranged for routine investigation of the alibi defense earlier, he would have been able to present Osborne's testimony at trial. Shabazz had more than sufficient time to conduct an investigation. He represented petitioner as early as October 16, 1998, almost two years before the commencement of the trial in September of 2000. Transcript of Evidentiary Hearing of Dec, 15, 2009, at 44-45 (testimony of Tariq El-Shabazz). Shabazz's testimony states that Shabazz mentioned he was considering an alibi defense as early as January of 1999, but needed to conduct investigation. *Id.* at 44-45. Shabazz further stated that petitioner and his family alerted him to "potential alibi witnesses very, very early on." *Id.* at 65.

Despite the extensive period of time available to conduct an investigation into an evident line of defense to the capital charges petitioner faced, petitioner was deprived of the most routine of investigations. Shabazz, apparently, first relied upon Billy Padden, an

31

investigator he had worked with previously, to conduct the investigation. Transcript of Evidentiary Hearing of Dec, 15, 2009, at 49 (testimony of Tariq El-Shabazz). However, Shabazz failed to ensure that Padden conducted a proper investigation and stated that "it was my belief at that time that all of the ongoing investigation was being completed and conducted, and when he had the information that was necessary for me, I would receive it." *Id.* at 49. This failure to supervise the investigation deprived petitioner of effective counsel.

For reasons not entirely clear, Padden did not provide Shabazz needed material from an investigation. Shabazz denies that Padden was not paid for his work, as Grevious alleges, but his testimony failed to explain why Padden failed to conduct an investigation into alibi witnesses and refused to provide Shabazz the investigation file. *Id.* at 49-50. Once an investigation was conducted, the second investigator, Grevious, was able to contact Osborne in a matter of days by twice visiting the restaurant and getting the names of the waitress who served petitioner and the manager on duty. Transcript of Evidentiary Hearing of Nov. 17, 2009, at 16-19 (testimony of Brian Grevious). Grevious was able to find Osborne quickly, despite the fact that twenty-three months had elapsed since the event–a delay caused by Shabazz's failure to ensure that a proper investigation was conducted long before.

Had Shabazz seen to it that a proper investigation was conducted much sooner, he could have ensured that all pertinent alibi witnesses would have been found in a timely

fashion and a proper notice of alibi witnesses could have been filed. When, belatedly, Shabazz finally directed Grevious to investigate, it took Grevious only a matter of days to uncover a neutral witness–Osborne–who, had he been found in a timely manner, would have corroborated petitioner's alibi. Nor is it surprising that Grevious's belated investigation proved fruitful. A reasonable attorney directing a responsible investigation could expect that a restaurant would be able to provide the names of its employees on duty on a particular night. Such potential independent witnesses would be the most obvious corroboration of petitioner's other, interested, alibi witnesses. Failure to conduct or properly oversee a basic investigation into petitioner's alibi defense constitutes ineffective assistance of counsel under *Strickland*.

The PCRA court unreasonably applied *Strickland* by failing to consider what steps counsel should have undertaken to make a reasonable investigation. Failure to consider whether counsel conducted a sufficient investigation is an unreasonable application of *Strickland*. *Rompilla*, 545 U.S. at 382-83; *Stewart*, 468 F.3d at 360-61; s*ee also Raygoza*, 474 F.3d at 964-65 (finding an unreasonable application of *Strickland* on similar facts). Finding that counsel provided effective assistance when counsel failed to investigate or interview a promising witness until days before a trial for first-degree murder is an unreasonable application of *Strickland*.

## 2. The State Courts' Determination that Petitioner was not Prejudiced was an Unreasonable Application of *Strickland*

To demonstrate the prejudice prong, the petitioner must show there is a reasonable probability that, but for counsel's error, the result of the proceeding would have been different in light of the totality of the evidence before the jury. *Strickland*, 466 U.S. at 694-95. This standard differs materially from the standard stated and applied in the PCRA opinion–notably in application of the last two prongs of the test, "(2) that witnesses would have provided material evidence at the time of the trial and that the witnesses would have been helpful to his case; and (3) that the proposed witnesses were available for trial and that the proposed testimony was truly necessary." The PCRA court's application of *Strickland*, and the Superior Court affirmance, was unreasonable in two ways: (1) the state courts required that the testimony be exculpatory without consideration of the other evidence presented at trial in contravention of *Strickland*'s dictate that prejudice be viewed in light of "the totality of the evidence before the judge or jury," 466 U.S. at 695, and (2) the state courts applied a blanket rule that testimony which would mirror other witnesses was "cumulative," and could not be prejudicial, in violation of *Strickland*'s requirement that prejudice be decided on the facts of the particular case. *See id.* at 693 (stating that "[a]ttorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial" and "an act or omission that is unprofessional in one case may be sound or even brilliant in another").

**a.**     **The State Courts Unreasonably Required that Osborne's Testimony Prove**

**Petitioner's Alibi without Consideration of Other Evidence**

The PCRA court, and the Superior Court in its affirmance of the PCRA court, required that petitioner meet a standard for showing prejudice that was greater than the reasonable probability required by *Strickland*. The PCRA court stated that "[t]o show prejudice defendant must establish that, but for counsel's errors, the outcome of the trial would have been different." PCRA Court Op. at 6 (citing *Commonwealth v. Bond*, 819 A.2d 33 (Pa. 2002)). This standard removes the "reasonable probability" language of *Strickland* and requiring a higher showing unreasonably applies *Strickland*'s prejudice prong.

Furthermore, the PCRA court, when applying the standard, did not view the evidence in light of the other evidence presented at trial. The PCRA court required that Osborne's testimony "place Appellant 'at the relevant time in a different place tha[n] the scene involved.'" PCRA Ct. Op. at 8. The Superior Court similarly found that the witnesses would not have been useful at trial. The Superior Court stated that Osborne "did not indicate at what time in the evening Appellant was present in the restaurant, nor could Mr. Osborne recall the time Appellant's party left." Super. Ct. Op. at 11. Further, the court noted that Szmyt "did not specifically identify Appellant as a customer and stated that she 'vaguely' recalled waiting on a group of individuals." *Id.*

*Strickland* does not require that a witness's testimony be exculpatory when viewed

in isolation, but rather that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* In making this determination, a habeas court must "consider the totality of the evidence before the judge or jury." *Id.* at 695.

When viewing the totality of the circumstances, I conclude, as the R&R does, that a reasonable probability[11] exists that, but for the failure to discover Osborne, the result of the trial would have been different. Both the prosecution's case and the alibi defense depended on eyewitnesses who had close relationships with those involved. The prosecution witnesses were family members of the victim who had an altercation with family members of the petitioner. The alibi witnesses who testified at trial were friends and family of petitioner. The fact that a disinterested eyewitness, Osborne, could have corroborated large portions of petitioner's alibi would have bolstered the credibility of the petitioner and other alibi witnesses. In addition, Osborne's testimony that it was "dark" outside when petitioner left, while not definitively proving that petitioner could not have been at the scene of the crime, as discussed above, puts into serious question whether petitioner had enough time to make it from the TGI Friday's to the scene of the shooting

---

[11] "Strickland v. Washington does not require certainty or even a preponderance of the evidence that the outcome would have been different with effective assistance of counsel; it requires only 'reasonable probability' that that is the case." *United States v. Day*, 969 F.2d 39, 45 n.8 (3d Cir. 1992).

by the time the prosecution witnesses testified he met with Kareema Latimer.

**b.      The State Courts Erred in Holding that Osborne's Testimony would be**

       **"Cumulative"**

Additionally, the PCRA court unreasonably applied *Strickland* in applying a rule that "counsel could not be deemed ineffective for failing to call witnesses whose testimony would be cumulative." PCRA Ct. Op. at 8 (citation omitted). The Superior Court incorporated the PCRA's discussion of the testimony's cumulative effect. Super. Ct. Op. at 12.[12] When applying *Strickland*, evidence cannot be discarded simply because similar testimony was given at trial. If the jury might give greater weight to the excluded evidence, a reasonable probability that the outcome would have been different can exist,

---

[12] Specifically the Superior Court stated:

Finally, the trial court aptly explained why any testimony offered by Mr. Osborne and Ms. Szmyt would have been cumulative of other testimony presented at trial:

Appellant testified to an alibi placing him at Friday's restaurant at the time the murder occurred. This alibi was repeated in the testimony of three other witnesses–Lynette Bright, Tiyanna Miller, and Kevin Johnson (N.T. 9/27/00, 928-1054; N.T. 9/28/00, 1054-1191). The testimony's cumulative effect renders it unnecessary, thus "counsel could not be deemed ineffective for failing to call witnesses whose testimony would be cumulative." ***Commonwealth v. Milligan***, 693 A.2d 1313, 1319 (Pa. Super. [Ct.] 1997).

Trial Court Opinion 6/6/06 at 8. As an appellant is not prejudiced by the failure of trial counsel to present merely cumulative evidence, an appellant's claim of ineffective assistance of counsel on this basis must fail. ***Commonwealth v. Spotz***, 587 Pa. 1, 896 A.2d 1191, 1229 (2006).

Superior Ct. Op. at 12.

even though other witnesses may have provided testimony similar to the excluded witnesses. *Washington v. Smith*, 219 F.3d 620, 634 (7th Cir. 2000).[13]

The situation here provides one such example: where defense witnesses are impeached for having a close relationship to the defendant, and prosecution eyewitnesses had a conflict with petitioner's family, the existence of disinterested witnesses corroborating the petitioner's alibi could weigh heavily in the jury's decision of which set of witnesses to credit. *See Brown v. Myers*, 137 F.3d 1154, 1157 (9th Cir.) (noting that the existence of other alibi witnesses could have changed the result at trial because "[t]he prosecution witnesses were family members [of the victim] who had witnessed one or both of the earlier fights"). Finding that there is no prejudice solely because the testimony would be in accord with the testimony of others and thereby "cumulative" is an unreasonable application of *Strickland*'s prejudice prong when such corroborative testimony would come from a witness that a jury could find more credible than those who testified at trial. *Washington*, 219 F.3d at 635.

As discussed above, Osborne's testimony, had it been presented at trial, would have corroborated the testimony of other witnesses that placed petitioner at the TGI Friday's at a time when petitioner could not have been at the scene of the murder in time

---

[13] Osborne's testimony may not even have been cumulative if that were the standard. *See Washington*, 219 F.3d at 634 ("Evidence is cumulative when it 'supports a fact established by existing evidence,' but [petitioner's] whereabouts on the day of the robbery was far from established–it was *the* issue in the case" (quoting Black's Law Dictionary 577 (7th ed. 1999)).

to consult with Kareema Latimer at approximately 8:00 p.m. or to commit the shooting before 8:23 p.m..

I find that a reasonable probability exists that, if the jury had heard Osborne's testimony, the jury would have found reasonable doubt. Petitioner satisfied his burden of showing prejudice and the state courts' findings otherwise were an unreasonable application of the Court's holding in *Strickland*.

### III. Conclusion

As the PCRA court made an unreasonable application of both prongs of *Strickland,* I conditionally grant Brown's petition for a writ of habeas corpus. I adopt the findings of the R&R with the exceptions, discussed above, of: (1) the finding regarding Shabazz's subjective awareness of the witnesses, as I instead find that Shabazz should have been aware of the witnesses, (2) the finding that Osborne stated it was not twilight, (3) the failure to explicitly find that the Superior Court unreasonably erred in finding the witnesses were not available and willing to testify, and (4) the failure to find that the prosecution's case required petitioner to have been at the scene of the shooting 15 to 20 minutes before the shooting to meet with Kareema Latimer. No certificate of appealability need issue as the respondents have an appeal as a right. Fed. R. App. P. 22(b)(3).[14] An appropriate order accompanies this opinion.

---

[14] Federal Rule of Appellate Procedure 22, titled "Habeas Corpus and Section 2255 Proceedings" states: "A certificate of appealability is not required when a state or its representative or the United States or its representative appeals." Fed. R. App. P.



22(b)(3).